with your argument in the final matter on today's argument calendar, 305 West End Holdings v. National Labor Relations Board, 21-522 and 21-973. Mr. Hunt. Thank you, Your Honor. My name is John Hunt. I represent the petitioners, 305 West End Holding and Ultimate Care Management. Petitioners have asked this court to vacate and review a decision of the National Labor Relations Board. This case arises from the acquisition of an independent living facility by 305 West End in December 2016. The property is located in Manhattan and previously was operated by Esplanade Partners and County Agency who are not parties to this proceeding. Some of the employees at the facility were represented by a local team of United Food and Commercial Workers Union. And following an unfair labor practice hearing, an administrative law judge concluded that West End was a successor at Esplanade and therefore it had unlawfully refused to recognize the union and had failed to bargain with it, also in violation of the National Labor Relations Act. West End subsequently filed exceptions to the decision of the board and the board's own counsel for the general counsel took the unusual step of filing exceptions to the ALJ's determination that West End was a successor. In short, the board's prosecutorial arm agreed with West End that it wasn't a successor at Esplanade. We still maintain that position and don't believe that from that as law, West End should be found to be a successor. Mr. Hunt, could you speak up just a little bit? Oh, sorry. Yes, we maintain that position and do not believe that West End is a successor to Esplanade. With respect to successors, the two seminal cases are the Supreme Court's decisions in Burns International Security and Fall River Dining and Fishing Company. And they looked at, examined whether there's continuity in terms of the operation of the facility and also whether there's continuity in terms of the workforce. And as to the workforce, there is no continuity unless an employer voluntarily chooses to hire more than 50% of the predecessor's workforce. And why wasn't that satisfied here? Because, Your Honor, because West End was subject to New York City's dislocated worker statute, which required us for a period of 90 days to hire building service employees, which we did. We went ahead and hired all those individuals. But didn't the ALJ find, as a factual matter, based on the testimony of the executive director, Kayani, that your client wanted to, chose to hire the workers from Esplanade? It wasn't simply compelled by the ALJ. It was wrong in reaching that decision. I think Mr. Kayani also testified that those individuals came with the building, as he phrased it. In other words, that it was a given that the company was going to have to hire the building service employees. The company, after it took over the property, did hire them. It also hired other employees too. In the 90-day period that instituted training, it started to renovate the building. But Mr. Hutt, I'm sorry to interrupt you, but I mean, it seems to me that the standard is a pretty tough one with respect to facts found by the ALJ, right? I mean, so the ALJ took testimony, and based on this testimony from Kayani, concluded that this was not driven by the ordinance. It was driven by a desire to hire as a facility. Your Honor, we do recognize that it is a high bar. However, we think in this case, what Mr. Kayani was referring to, was that he was testifying regarding the, in the hiring decisions, that they didn't intend to discriminate against anyone on the basis of their union activities, or the union status, their membership in the local, or anything else. They simply absorbed them all, and at the end of the 90 days, what they were trying to accomplish was transition from an independent living facility, which had been under Esplanade, over to an assisted living facility, which requires licensing by the state of New York. West End attempted to do that, and during the 90-day period, they tried to retrain employees, evaluate employees, and when the 90 days were over, and then a few weeks later, after they had time to freely evaluate the hiring decisions, it turned out that there were individuals who were subject to the ordinance, who were let go, and that there were no longer, there was no majority on the part of union employees. Rather, as found by, the ALJ also found, that by late March, early April of 2017, the number of non-union, or non-Esplanade employees was greater than the number of previous Esplanade employees. We think that the appropriate, that is the appropriate point after the expiration of the ordinance, in which to evaluate whether it's a successful issue. In fact, could I ask you to talk about the validity of the bargaining unit, because that struck me as perhaps a stronger argument. Yes, your honor, we, thank you, we believe that what was actually an operation here is what's referred to as a member's only union. In other words, there were the, even though the definition of the bargaining unit was a wall-to-wall unit, that is, it should be just about every hourly employee in the building, there were individuals that just weren't represented by the union. The, there were the recreation employees who were not represented by the union. That's five, five employees, right? Yes, I believe that's right, your honor. And also, in addition to that, there were folks who were, at least two employees, who were statutory supervisors, who were in the union. And there were additional employees, aside from the recreation employees, who the union tried to recruit and somehow managed to opt out of membership. So, how many is that? So, there's the five recreation employees who, like, nobody even knew about, then there's a couple of supervisors who probably shouldn't have been in the unit, but were allowed to be in the unit, and then there's how many others who didn't pay dues, but were still clearly within the defined unit? I believe there were about three or four, your honor. And under those, under those facts, we would submit that the union wasn't entitled, entitled to a presumption of majority status. And for that reason, in addition, West End should not be deemed to be a successor, simply because it acquired the property commissible. But the, am I not correct that the ALJ made a specific finding that the, that the union was, in fact, bargaining for all of those employees and that, and that even the, the five non-union members, the recreation employees, got the, got the, whatever it was, the 40, the 40 cent raise, the same raise that the union members got by virtue of the, bargaining of the union under the CBA. And that, and that this was, and that as a, as a factual finding of the ALJ, the union was getting the, the benefits for the non-union members, as well as for the union members. I believe that that's correct, your honor. But at the same time, you had individuals who weren't paying union dues. They weren't receiving union health insurance. They were getting the same benefits. They were getting the same raise, right? My recollection, your honor, is that the ALJ concluded that there were raises that coincided with the raises in the collective bargaining agreement, but as to the other benefits. Well, I mean, that was the, that was the evidence that led to the finding that the union was not negotiating simply for its own members and making deals simply for its own the proposition that management simply decided in its own discretion to give, to give those raises to the non-union members. The ALJ found that that was a consequence of the, of the bargaining under the CBA. And we would submit, your honor, that, that, well, that finding was incorrect, but more so that the other hallmarks of union membership just weren't there. Can I just, I mean, the union didn't bill Esplanade for those other employees, right? They only billed for the employees who were dues-paying union members, right? That's correct, your honor. That would be, in our opinion, evidence that this operated as a members-only union. Well, that's a classic example of a members-only union, right? Correct, your honor. I see my time has elapsed. I have a question for you about the, the, the release given by Hardy. And I, I, my question is, why isn't that a release applicable to, to prior offenses, prior claims that Hardy might have with respect to things that had previously happened, rather than a, rather than a waiver of rights with respect to anything that they might do to her in the future? That seems to me to be a rather odd interpretation of a release to say that you, that you give a release against, a release of your rights and a waiver of your rights with respect to any, any violation of law that may be committed against you in the future. Is that what that release meant? Well, I believe at the time she signed the release, your honor, was, it was shortly after the transition to West End. The release is signed, the release is signed February 2017, right? Yes, that's, I believe that's correct. But it did, you know, I mean, it, she was never hired by West End. West End does its first range of hiring in December of 2016, right? That's correct. So by the time this agreement is signed between Hardy and Esplanade, presumably at that point, West End is already the successor and has already made its hiring decisions with respect to the former workforce, right? Well, it's, we would submit that it's made some hiring decisions, but again, with respect to the ordinance, we were required to hire the, the building. Okay, but when was the decision not to hire Hardy, before or after February 2017? I'm not certain, your honor. Well, if it's, would that matter? I mean, in other words, if it's before the execution of the release, it would seem to me that there's a stronger argument for that it's enforceable against the successor. If it's, so I don't know, you don't know the date on which the alleged violation with respect to West End took place? My recollection is that it, she was not hired and the decision not to hire her took place during December. However, Ms. Hardy did not testify at the hearing. Okay. So December of 2016? Yes, that's correct. But you're not claiming, are you, that the release was a release of, with respect to in the future after the signature of the release? No, we would argue, no, we would submit that it was, it applied to violations at that time. I thought the release was given to the predecessor. Isn't it correct that the release was given to the, to the predecessor? Yeah, and I think it also referred to the, it also referred generally to anything that occurred with respect to her employment at the facility. So that would encompass West End as well. Well, anything, in other words, you're, in other words, you are arguing that she was giving a release for anything that they might, that might be done to her in the future. No matter what you might do to me in the future, I give you for $14,000 or whatever it was, I'm giving you a release of all future wrongs that may be committed against me? Related to my employment? No, our point would be that the release was, would release anything that happened up to the time she signed, not afterwards. Even though it covers claims arising out of Esplanade's conduct? Right, but that kind of conduct, I guess, would have taken place during December. Right. Okay. So Esplanade and its affiliates, successors, and assigns. And so it's signed by Esplanade, the successors are not a party to this agreement, right? I mean, West End, you're disputing whether they're a successor at all, but West End is not a party to this agreement, right? That's right. So to the extent they are the beneficiaries of it, it's as a successor, nothing else, right? To the extent we're determined to be a successor, then we would be a beneficiary of that document. Okay. So your argument is that this would cover your client in the event that you're a successor, but only for conduct that took place before execution in February of 2017? Yes. Is that right? That's correct. Okay. You've reserved three minutes for rebuttal, Mr. Hunt. So we'll hear from the NLRB, Ms. Sheehan. Good morning, Your Honors. May it please the Court. Barbara Sheehan for the National Labor Relations Board. I'll go, I think, through a couple of things that came up during opposing counsel's arguments. I'll start with what Judge Sullivan labeled what he was most interested in, the validity of the bargaining unit argument. And I think what is getting lost in this discussion is that for a contract to be deemed a members-only contract, so that the presumption of the majority support goes away, you have to show that the parties intended for the contract to be for the benefit of only union members. And here, so I would take issue, I don't know that the ALJ made a finding as to the invoices, that the union was only invoicing dues-paying members. What I will say that I'm confident about what the Administrative Law Judge did find is he found that the union representatives came to the facility in the interest of administering the contract. They filed grievances, and several of the grievances were on behalf of the entire union, so not individuals. So they filed grievances for the unit. They submitted information requests for the unit. They submitted a demand for bargaining for the unit. But why do they get to just decide to selectively enforce what is supposed to be a union-only shop? So they don't make everybody pay union dues, and they don't collect on behalf of their employees the fees that are supposed to go toward health care and etc., right? Listen, I can't explain to didn't collect fees. I don't know, or collect its dues, or to the extent it didn't collect its dues. I don't know. There's not testimony reflecting why it chose to do that. But sloppy sort of housekeeping doesn't render the contract one for the benefit of dues-paying members only when there's evidence in the record that that's not what happened. So whether the union was taking in less money for its own... So what health care benefits did the non-union dues-paying people get health care benefits? There's no... So there's testimony in the record. Unfortunately, there's no specific finding from the administrative law judge. This was a case where there was a lot of conflicting documents, a lot of conflicting testimony. So the best we have as it relates to your honor's question... There's two lists. I'm sorry to interrupt you, Ms. Sheever. There's two lists, right? One is the union dues list, and the other is the insurance premium payment list, and they are exactly overlapping, right? I believe that's accurate, but there's not a What other finding could there be based on those two lists, which are part of the record? I'm sorry, what could the finding... What would be the explanation for why there's that perfect overlap if the goal of the union was to benefit all the employees with respect to things like health care? I think a perfectly plausible explanation could be that the employees were getting health care from another source. They could be getting it from another spouse. Whether there is circumstantially this evidence that there was overlap, I don't know that that compels a finding that the union was existing strictly for the benefit of its employees. So you have that, what your honor just pointed out, where there's not a specific finding about what was the purpose about that, and the employer had the opportunity to ask employees and bring out evidence. And what we have instead is specific findings from the judge, also supported by documentary evidence, that this union existed not for the benefit just of members, but that the contract was administered for the benefit of all employees. All right, but I'm looking at the language of Ace Duran-Halling, right? That's kind of a seminal case in this space, right? And it basically says that the practice in that case made it clear that the parties merely regarded the collective bargain contract as an arrangement under which the union agreed to check off dues, health and welfare, and pension payments for the union members only, the people who were actually dues-paying members, right? I mean, I'm not going to dispute Ace Duran. Why isn't this just like that? I'm having trouble seeing a distinction. Well, because there is, I don't think in Ace Duran you saw the application of the contract also that did benefit the entire union. They got the increase in wages, specifically consistent with the contract, the increase in wages, other benefits, overtime pay, premium pay, weekend pay, all of that was administered consistent with the contract, which I don't believe you had in Ace Duran. So I would say on that ground that you do have very specific instances in this case of equitable and uniform administration of this contract to all members. Sorry, not even members, to all units, by members. I was a little bit loose in my speech there. I mean, by everybody that belongs in the bargaining. In your view, if the union gets a raise and gets certain benefits for all the employees, but only has 15 percent of the workforce signed up in the union, that's enough, nonetheless, to meet the requirements for the valid bargaining. So I guess I'm questioning, to make sure I understand, I'm going to answer the question the best I understood it. You let me know if I missed it. So employees do not have to pay full union dues, but still need to be represented by the union. They can pay just core agency fees. So if this isn't a matter of that, so to answer your question, then I would say absolutely 15 employees, and that's not the case in this case, but absolutely in your example, 15 employees could be paying core agency fees and therefore considered non-dues-paying members or agency payers or back objectors, however you want to look at it, and still this union would enjoy majority support. Because, for instance, the board, and I think we point this out in our brief, the board in right-to-work states, so where employees do have no union security clauses in the contract, in those states, successorship analysis counts everybody in the unit. So it's no different in this case. So I'm not sure that, is that what you were looking for as an answer, or were you thinking a different line? No, I'm just trying to figure out, I mean, you said a sloppy union doesn't alter the presumption, and I'm just wondering, well, sloppy or willful, I mean, it's not clear to me if it's supposed to be a union-only shop, right? Right, but the union, but where the presumption of majority status, where you're going to strip the union of the presumption that it is representing its employees, there's also the argument that the fact that if, let's say I'm one of the unit employees who was working at Esplanade and now I'm working at 305 West End, that if I am in the unit and I'm represented by the union, and I'm getting my wages increased every year, and I'm getting my benefits, and I'm getting my benefits, and I'm not paying dues, that does not necessarily mean that I don't support the union. That could mean, in fact, the opposite, and the board notes this, it doesn't compel this, but the flip side of it is I could view it as a pretty darn good arrangement that I'm not paying for benefits that I'm receiving. The issue becomes when the union creates a contract whereby it's basically just trying to funnel money to the union and not represent the unit. That's the problem. That's what the court, I think, really needs to look at. Is the union only in name only representing this unit for the sole purpose of only representing the employees who are paying for it? That is a problem, and that is not what happens here. Again, there were grievances filed unit-wide. There were information requests filed unit-wide. There was uniform administration of the contract in terms of pay. There was the bargaining request on behalf of the whole union. I don't think this is an instance where the employer is able to show anything more than I can't explain why the union wasn't collecting its dues. Maybe it was prioritizing dues somewhere else, but at the end of the day, that's not what matters. What matters is, was it still representing all of these employees regardless of who was paying dues? I'm sorry, I've been talking to you. Go ahead, Judge LaValle. Well, I just wanted to interject. Isn't it correct that the ALJ also explicitly discredited the testimony of a part of management, Levitt, when he testified that when she, I guess it's a she, was simply exercising discretion in giving the same raise to the non-union employees as to the union ones? Absolutely. ALJ found that that was not creditable and found that they were given the raises because the union's contract compelled it. Absolutely. That was a finding by the administrative law judge. I think this goes back to one of the first things that opposing counsel recognized during his time that I think Judge Sullivan even highlighted as well, that the employer has a very high burden on two fronts here. First, from a factual standpoint. First, from what they talked about first, which was Kayani's Displaced Workers Act. And then also, even assuming they get past that and even assuming this court doesn't find that 21 of 40 people, notwithstanding a workforce preservation statute, 21 of 40 is still a majority. Even then, they still are coming up against very strong headwinds factually to show that the board factually committed errors when it made a finding that this was an appropriate unit that enjoyed majority support. So I think, unless there are other questions, I'm happy to talk about Hardy's release. But I think the last thing I wanted to highlight was that one of the very first things that got said at the beginning is that it's an incredibly high bar on all fronts on several pronged analyses for this employer to show that the board's decision is not worthy. Would you just briefly address Ms. Hardy's release? Sure. So I think factually, I'll just set a couple things right. Everybody's absolutely correct. The release was signed in February 2017. Ms. Hardy, so I know there was some, like, when was the decision made not to hire? I'm sorry, what was the date you said? February what? The exact date. Judge Sullivan was absolutely right. It's February, I want to say 10. It could have been 2, 2017. So February 2017. Yeah. Give or take 2 to 10, somewhere in there. And Ms. Hardy's decision not to be hired had to have been made by December 5. She was not a building service employee. That's in the record. She was a front desk concierge. So they hired their initial and representative compliment by December 5. Of 2016. Of 2016, sorry. Yes, of 2016. So the decision regarding Hardy's non-hire had to have been made by no later than December 5, 2016. So the board's view, again, this is another, this case has multiple parts where the board rests its finding on two different paths, either one sufficient to sustain. The first one is, that's the, I'll talk, that's actually the second one the board talks about, but it seems to be the one the court was more interested in discussing, and that is this release specifically does not bind Esplanade, or sorry, it does not, sorry, it does not apply to the company here. The release is specifically between Hardy and county agency slash Esplanade. And its successors. And its successors, but typically the way that that sort of language works in a release is that to the extent the successor comes in and inherits your unlawful actions as the predecessor, you will also be indemnified in that circumstance. But a successor doesn't mean necessarily, the phrasing of it includes the successor, does not mean that county, that, get everybody mixed up in this case, sorry, that West End and Ultimate were free to come in and commit their own new violations of the act. But well, but I guess the argument is they're not new violations if they took place before the execution. But it really does turn that on their successor, because you're arguing that they are successors for purposes of labor, you know, these NLRB rules and labor law, right? Yes, absolutely, right. They're not successors under the terms of the agreement. Under the release agreement, right. And what's the basis for saying that? Is it defined in the agreement? So the, but the board speak, the board drops a citation to the kinds of cases, and I think it's Golden State, Bobilene, I think is the name of the case, where the board in that case talks about the kind of release, as it relates to successors, that you can't as a basic proposition contract, or not be party to a contract, but then use that as a defense for your own independent violations. Was there evidence as to what this release was given in relation to? What was the, what was the claim? What was the claim that Hardy had made, or that was made on her behalf that entitled her to, or that resulted in her receiving some money in exchange for a release? So it's referenced if the, and I believe in the employer's brief, they cite the specific appendix sites, it's 2570, I think in there, somewhere in there, there's a series of releases, and a series of communications. And these releases are characterized in those documents as severance payments. So I don't know at the time that Hardy, I'd have to go back and check the record about when charges got filed. I don't know at the time that Hardy signed the release, she or the union had brought charges alleging an unlawful refusal to hide at that point. All I know is that- So then you're saying that this release, in fact, related to not being hired by the successor, by 305 West End? No, no, no, because the release, remember, is with Esplanade. Esplanade, Esplanade is the party to the agreement. And in the communications, there is reference to severance payment thanking her for employment with Esplanade. There's nothing in the documents ever bringing in Ultimate or 305 West End. Why should Esplanade be paying her? Why should Esplanade be paying her a settlement for the refusal of 305 West End to hire her? I couldn't tell because there's not testimony Hardy didn't testify. I don't know why there were a series of severance agreements executed between 305, sorry, executed between Esplanade and Kelly. But I would remember, so I hate to get bogged down in this, before I could quickly point out that the second position then of the board is that this contract, even if you found that somehow as a non-party county, or sorry, that Esplanade, oh my goodness, I'm so sorry, that the company, I'm just going to call them the company, that the company could somehow use this, even though they're not a party to it, notwithstanding the board's finding. But the board has found that on its face then, this contract cannot bind the board's remedial authority. So there are two different bases. So if the court is uncomfortable with the successor issue and whether 305 West End should be the benefit of this, I would urge the court then to look at the cases that the board cites where you cannot enter into one of these types of private agreements that bind the public policy vindications of the board. So I just want to be clear on that. Your view is that even if this was an agreement between West End and Hardy, it would not be enforceable with respect to the NLRB? I believe that that's an accurate reading, yes, of the board's decision. It was that finding of the board is not predicated on the parties. That finding is predicated on statutory empowerments of the board, yes. Okay, so Hardy gets to keep the money and she gets to be reinstated because this is in essence a contract against public policy. That's the position? Well, the traditional remedy of the board, so I've got to take issue a little bit because it makes it sound like she's not entitled to any of these things or that the board did something strange here. This is a traditional remedy. So she's entitled to any back pay that she can show that she was entitled to during the time of her unlawful refusal to hire and the instatement date. And it's got to be mitigated. There's a second proceeding for this in front of the board. Evidence is put on. She can show that she earned this, earned that. The employer can come on and say, you didn't look for work well enough, so we can litigate over that. And then at the end of the day, there'll be a back pay specification that can be litigated all the way up to this court again. And then yes, she is entitled to instatement. She can refuse that instatement, but the back pay cutoffs as soon as the employer makes that offer of instatement. If she says, I live in Vegas now, I don't want to come work in Manhattan, that's up to her. Okay, but I mean, it seems to me that the other part of this contract is not getting the benefit of the contract. The other party is Esplanade. Esplanade got released. Well, let's assume that, well, it seems to me what you're saying is that the contracts like this are not enforceable, right? They don't bind the NLRB, let's put it that way. So, but how is, if the NLRB can take whatever remedial steps it thinks appropriate, including reinstating Hardy, how does this during the proceedings where they're determining the back pay, the amount of money she's owed, the back pay specification, the employer is free to argue in that proceeding that this $14,000 that Hardy got under the agreement should be counted against her overall back pay figure, if that makes sense. So, there is going to be an opportunity for the employer to make this argument that depending on how enforcement in this case is, how it's enforced. But if, for instance, the court finds that this doesn't bind the company or that the company was a benefit to this and they should be benefiting then from the $14,000 in their column, there'll be an opportunity during the back pay proceedings to make that argument. So, you're saying the employer can recoup in some way the $14,000 that was paid in settlement? They can certainly argue. I'm not going to say definitively how, because I don't know exactly how the case is going to shape and how it's going to look when it goes in front of a back pay compliance officer. So, the best I can say right now is the employer is certainly free to make that argument and it goes before the board at decision issues and it's no different. It's just the second part of a bifurcated proceeding. But what I'm asking you is not what the result will be, obviously. I'm asking whether the board would have the power in that proceeding to allow recoupment of the settlement that had been paid to avoid the circumstance that Judge Sullivan described in which the employer gets a double compensation, gets a settlement, and also gets the retraction of the adverse consequence that gave rise to the settlement. Absolutely. The board has the ability during the back pay compliance to make that determination. So, yes, they could say $14,000 comes off the top of what she's owed. And even then, this court can review that if somebody is unhappy with that, regardless of how the board decides. Anybody who was on any party who's unhappy with that decision can seek review after they go through the administrative process in this court. So, it doesn't end here and it doesn't even end in front of the compliance officer at the time of the back pay specification. Okay. Ms. Jehunt, you've got three minutes. Thank you for your time. Ms. Jehunt? I apologize, Ron. Just a couple of things. With respect to the return of the ALJ's decision or the effectiveness of factual findings, I just would like to point out that the board itself, the counsel for the general counsel, submitted a brief to the board with respect to the incorrect finding regarding the effect of the displaced workers statute. They took our position. We've taken that. Right. I saw that. The counsel basically said that this ordinance was binding and you guys had to hire their Esplanade employees. But the ALJ also found, independent of that, that that was the intent and desire of your client, right? We think that, well, yes, Your Honor, we think, but again, we think that finding's the finding of the ALJ, right? Yes, but we very much disagree with that. Again, I think if you look at Mr. Cahoney's testimony, he did say the building servers, worker employees, came with the building. They come with the building. And therefore, we had no choice but to hire them block, stock, and barrel as a worker. So there really wasn't any free choice that was exercised at that point. Well, I mean, those two are not, those two situations are not incompatible. One can be compelled to do something, which is the thing that one wants to do because of the benefits of continuity, the employer's familiarity with the job and the building and so forth. The fact that you're compelled to doesn't mean that you didn't want to. True. And I would point out that there was significant testimony at the hearing from both Mr. Cahoney and other witnesses as well regarding West End's dissatisfaction with the building, the deplorable state that it was in, the unhealthy, unsanitary conditions that they had to remedy and therefore had to conduct training. So therefore, we think there was an insecurity of finding that we were compelled to hire particularly the housekeeping employees and as well as the maintenance employees too. So again, he did testify that the employees come with the building servers. So we did have to take those individuals. With respect to the collective bargaining agreement with the union security clause that it didn't enforce and that it didn't even completely ignored an entire segment of the workforce, the recreation force. But let me, and so look, there's a presumption of majority support, right? Normally there is, we don't think there is. As a general matter, there's a presumption of brief and today to certain things that might be inconsistent with this being a union only shop, like that they're not collecting dues on anybody who's not getting health benefits, that there are five people they don't even know anything about and eight other people who don't pay any dues at all. But it doesn't get close to a majority of the unit, does it? Well, if you, I think it's no, but I think it's enough to discount the idea that they represent the majority. The majority of people are paying dues, right? I believe they were, that's correct. So that's what I don't understand. There's a majority of, there's a presumption of majority support. Here we have majority support. We have a majority of people who are actually paying union dues. And so isn't that enough? That's my question for you. Your Honor, I would say that it isn't, particularly in a situation where you have entire segments of the bargaining unit or that are subject to the unit definition that aren't being represented by the union at all, the recreation. We've also got, again, at least two individuals who are statutory supervisors that are participating in the union, they're members of the union. So I think all those things add up to a, should add up to a conclusion that this was a members-only union, and it was not entitled to a presumption of majority status. Okay. Thank you. Thank you very much. We'll reserve decision. That concludes.